THOMAS JEFFERSON UNIVERSITY, DBA THOMAS
JEFFERSON UNIVERSITY HOSPITAL *v.* SHALALA,
SECRETARY OF HEALTH AND HUMAN SERVICES

No. 93–120.   Argued April 18, 1994—Decided June 24, 1994

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, SCALIA, and SOUTER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which STEVENS, O'CONNOR, and GINSBURG, JJ., joined, *post*, p. 518.

*Ronald N. Sutter* argued the cause for petitioner. On the briefs were *James M. Gaynor, Jr.,* and *Amy E. Hancock.*

*Amy L. Wax* argued the cause for respondent. With her on the brief were *Solicitor General Days, Assistant Attorney*

*General Hunger, Deputy Solicitor General Kneedler, Robert V. Zener, Robert D. Kamenshine, Harriet S. Rabb, Darrel J. Grinstead, Henry R. Goldberg,* and *Thomas W. Coons.**

JUSTICE KENNEDY delivered the opinion of the Court.

Although Medicare reimburses provider hospitals for the costs of certain educational activities, the program is forbidden by regulation from "participat[ing] in *increased costs* resulting from *redistribution of costs* from educational institutions ... to patient care institutions." 42 CFR § 413.85(c) (1993) (emphasis added). In denying reimbursement for the disputed costs in this case, the Secretary of Health and Human Services interpreted this provision to bar reimbursement of educational costs that were borne in prior years not by the requesting hospital, but by the hospital's affiliated medical school. The dispositive question is whether the Secretary's interpretation is a reasonable construction of the regulatory language. We conclude that it is.

## I

## A

Established in 1965 under Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U. S. C. § 1395 *et seq.* (1988 ed. and Supp. IV), Medicare is a federally funded health insurance program for the elderly and disabled. Subject to a few exceptions, Congress authorized the Secretary

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, *Diane M. Signoracci, Catherine M. Ballard, Richard A. Cordray,* and *Simon B. Karas,* and by the Attorneys General for their respective States as follows: *Winston Bryant* of Arkansas, *Charles M. Oberly III* of Delaware, *Richard P. Ieyoub* of Louisiana, *Hubert H. Humphrey III* of Minnesota, *John P. Arnold* of New Hampshire, *G. Oliver Koppell* of New York, *Ernest D. Preate, Jr.,* of Pennsylvania, *Jan Graham* of Utah, and *James S. Gilmore III* of Virginia; and for the American Hospital Association et al. by *Ronald N. Sutter, Mary Susan Philp,* and *Joseph A. Keyes, Jr.*

of Health and Human Services (Secretary) to issue regulations defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute. § 1395x(v)(1)(A). That authority encompasses the discretion to determine both the "reasonable cost" of services and the "items to be included" in the category of reimbursable services. *Ibid.* Acting under the statute, the Secretary, by regulation, permits reimbursement for the costs of "approved educational activities" conducted by hospitals. 42 CFR § 413.85(a)(1) (1993). The regulations define "approved educational activities" as "formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care." § 413.85(b).

Graduate medical education (GME) programs are one category of approved educational activities. GME programs give interns and residents clinical training in various medical specialties. Because participants learn both by treating patients and by observing other physicians do so, GME programs take place in a patient care unit (most often in a teaching hospital), rather than in a classroom. Hospitals are entitled to recover the "net cost" of GME and other approved educational activities, a figure "determined by deducting, from a provider's total costs of these activities, revenues it receives from tuition." § 413.85(g). A hospital may include as a reimbursable GME cost not only the costs of services it furnishes, but also the costs of services furnished by the hospital's affiliated medical school. § 413.17(a).

That brings us to the regulation here in question. Section 413.85(c) sets forth conditions governing the reimbursement of educational activities.[1] In a sentence referred to by the

---

[1] Title 42 CFR § 413.85(c) provides in full:

*"Educational Activities.* Many providers engage in educational activities including training programs for nurses, medical students, interns and residents, and various paramedical specialties. These programs contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical per-

parties as the "anti-redistribution" principle, the regulation provides that "[a]lthough the intent of the [Medicare] program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units." *Ibid.* In a portion of the regulation known as the "community support" principle, § 413.85(c) also states that the costs of educational activities "should be borne by the community," but that "[u]ntil communities undertake to bear these costs, the [Medicare] program will participate appropriately in the support of these activities." *Ibid.*

B

Thomas Jefferson University Hospital (Hospital) is a 700-bed teaching hospital in Philadelphia, Pennsylvania. The Hospital has been a qualified Medicare provider since the program took effect in 1966. Petitioner Thomas Jefferson University (University) is a private, not-for-profit educational institution that operates the Hospital and other entities, including the Jefferson Medical College (Medical College). As a teaching facility, the Hospital provides

---

sonnel. It is recognized that the costs of such educational activities should be borne by the community. However, many communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing health care. Until communities undertake to bear these costs, the [Medicare] program will participate appropriately in the support of these activities. Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units."

The language in § 413.85(c) has been in effect since the beginning of the Medicare program, although it was formerly designated 42 CFR § 405.421 (1977) and 20 CFR § 405.421 (1967).

Medicare-approved GME programs for postgraduate interns and residents in numerous medical specialties. The programs are conducted at the Hospital by Medical College faculty. Because of their common ownership by the University, the Hospital and the Medical College are considered affiliated or "related" organizations under Medicare regulations. 42 CFR § 413.17(a) (1993). As a result, the Hospital is entitled to reimbursement for all eligible patient-care, educational, and administrative costs carried on the books of the Medical College. *Ibid.*

Nevertheless, for reasons not clear from the record, the Hospital did not seek reimbursement for any GME costs during the first eight years of the Medicare program's existence. During the next 10 years, however, from 1974 through 1983, the Hospital sought and received reimbursement for three categories of salary-related GME costs: (1) salaries paid by the Hospital to Medical College faculty for services rendered to the Hospital's Medicare patients; (2) salaries paid by the Hospital to residents and interns; and (3) funds transferred internally from the Hospital to the Medical College as payment for faculty time devoted to the Hospital's GME program. The Hospital did not seek reimbursement during that period for its other, non-salary-related GME costs (namely, the costs of administering the Hospital's GME programs), and those costs were borne by the Medical College.

In 1983, Congress adopted a more restrictive method of reimbursing hospitals for inpatient medical services, see 42 U. S. C. § 1395ww(d) (1988 ed. and Supp. IV), but it retained the more lenient method of reimbursement for medical education costs. 42 U. S. C. § 1395ww(a)(4) (1988 ed., Supp. IV). In 1984, when the new cost reimbursement regime was implemented, the Hospital reviewed its claim for costs associated with its GME programs to determine whether it was identifying all costs eligible for reimbursement. This review resulted in an increased claim reflecting clerical costs

incurred by the Medical College for activities associated with its GME programs.[2]

The following year, in an effort to further refine its cost allocation techniques, the Hospital retained an accounting firm to compute the Hospital's total GME costs for fiscal year 1985, the year here in question. Fiscal year 1985 later became especially significant because, under a new reimbursement scheme enacted in 1986, it is considered the Hospital's base period, to which all later claims for GME cost reimbursement will be tied. See 42 U. S. C. § 1395ww(h). After completing the cost study, the accounting firm reported that the Hospital had incurred GME program costs totaling $8.8 million, a figure that included direct and indirect administrative costs not previously claimed by the Hospital. The report was submitted to petitioner's assigned fiscal intermediary, whose function is to review petitioner's annual cost reports and to calculate the appropriate level of reimbursement under applicable statutes and regulations. See 42 CFR § 405.1803 (1993). Although petitioner sought reimbursement for the full $8.8 million, the fiscal intermediary allowed only those salary-related costs that had been reimbursed earlier (after adjustment for inflation). The fiscal intermediary disallowed reimbursement for all nonsalary-related GME costs that the report identified (amounting to approximately $2.9 million). App. to Pet. for Cert. 10a. Petitioner then appealed to the Provider Reimbursement Review Board, an intermediate appellate tribunal within the Department, which reversed the decision of the fiscal intermediary in part and allowed reimbursement for all of the GME costs documented in the cost study.

The Secretary, acting through the Administrator of the Health Care Financing Administration, modified the Board's decision and reinstated the fiscal intermediary's ruling. The Secretary concluded that the anti-redistribution clause of

---

[2] The fiscal intermediary allowed these clerical costs at first, but later determined that such allowance was in error.

§ 413.85(c) prohibits the shift of approved educational costs from an educational unit to a patient-care unit, even if the educational activities for which reimbursement is sought are the kind of activities traditionally engaged in by Medicare providers. *Id.*, at 35a. Since the nonsalary GME costs here in issue were borne in prior years by the Medical College, the Secretary ruled that reimbursement of these costs would constitute an impermissible "redistribution of costs" under § 413.85(c). *Ibid.*

The Secretary also relied on the community support language in § 413.85(c) as an independent ground for denying the requested reimbursement. According to the Secretary, this language prohibits Medicare reimbursement for educational activities that "have been historically borne by the community." *Ibid.* That the Hospital had failed to seek reimbursement for the disputed costs in previous years was, in the Secretary's view, "evidence of the communit[y's] support for these activities." *Ibid.* "To allow the community to withdraw that support and pass these costs to the Medicare program" would violate the community support principle and would "encourage the community to abdicate its commitment to education to an insurance program intended to provide care for the elderly." *Ibid.*

Petitioner filed a petition for review in the District Court seeking reimbursement for the $2,861,247 in GME costs that the Secretary had disallowed. *Id.*, at 10a. On cross-motions for summary judgment, the court ruled in the Secretary's favor, accepting her interpretation of the anti-redistribution and community support clauses as a reasonable construction of § 413.85(c). *Thomas Jefferson Univ.* v. *Sullivan*, CCH Medicare & Medicaid Guide ¶ 40,294, p. 30,959 (ED Pa. 1992). The Third Circuit affirmed without opinion, judgment order reported at 993 F. 2d 879 (1993), thereby creating a conflict with the decision of the Sixth Circuit in *Ohio State Univ.* v. *Secretary, Dept. of Health and Human Services*, 996 F. 2d 122 (1993), cert. pending,

No. 93–696, concerning the validity of the Secretary's interpretation of the anti-redistribution clause. We granted certiorari, 510 U. S. 1039 (1994), and now affirm.

## II

Petitioner challenges the Secretary's construction of § 413.85(c) under the Administrative Procedure Act (APA), 5 U. S. C. § 551 *et seq.* The APA, which is incorporated by the Social Security Act, see 42 U. S. C. § 1395oo(f)(1), commands reviewing courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. § 706(2)(A). We must give substantial deference to an agency's interpretation of its own regulations. *Martin* v. *Occupational Safety and Health Review Comm'n,* 499 U. S. 144, 150–151 (1991); *Lyng* v. *Payne,* 476 U. S. 926, 939 (1986); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Ibid.* (quoting *Bowles* v. *Seminole Rock & Sand Co.,* 325 U. S. 410, 414 (1945)). In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring* v. *Jenkins,* 485 U. S. 415, 430 (1988). This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Pauley* v. *BethEnergy Mines, Inc.,* 501 U. S. 680, 697 (1991).

Petitioner challenges the Secretary's construction of both the anti-redistribution language and the community support

language of § 413.85(c). Because we conclude that the Secretary's interpretation of the anti-redistribution clause is neither "'plainly erroneous [n]or inconsistent with the regulation,'" *Tallman, supra,* at 16–17, and because its application suffices to deny reimbursement of the disputed costs in this case, we need not pass upon the Secretary's interpretation of the community support language.

The anti-redistribution clause is contained in the final sentence of § 413.85(c), which states:

> "Although the intent of the [Medicare] program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in *increased costs* resulting from *redistribution of costs* from educational institutions or units to patient care institutions or units." (Emphasis added.)

The meaning of this sentence is straightforward. Its introductory clause defines the scope of educational activities for which reimbursement may be sought: To be eligible for reimbursement, the activity must be one that is "customarily or traditionally carried on by providers in conjunction with their operations." It is the language that follows, however, that imposes the relevant restriction on cost redistribution. The second clause provides that, notwithstanding the activity for which reimbursement is sought, the Medicare program will not participate in the "redistribution of costs from educational institutions or units to patient care institutions or units."

The Secretary's interpretation gives full effect to both clauses of the relevant sentence. The Secretary interprets the regulation to allow reimbursement for costs of educational programs traditionally engaged in by hospitals, but, at the same time, to deny reimbursement for "cost[s] previously incurred and paid by a medical school." Brief for

Respondent 26 (emphasis deleted); see also § 413.85(b) (defining "approved educational activities" that are eligible for reimbursement as "programs of study usually engaged in by providers in order to enhance the quality of patient care"). The Secretary's reading is not only a plausible interpretation of the regulation; it is the most sensible interpretation the language will bear.

The circumstance addressed by the anti-redistribution clause is a hospital's submission of "increased costs" arising from approved educational activities. The regulation provides, in unambiguous terms, that the "costs" of these educational activities will not be reimbursed when they are the result of a "redistribution," or shift, of costs from an "educational" facility to a "patient care" facility, even if the activities that generated the costs are the sort "customarily or traditionally carried on by providers in conjunction with their operations." § 413.85(c). The Secretary's reliance on a hospital's own historical cost allocations, along with those of an affiliated medical school, is a simple and effective way of determining whether a prohibited "redistribution of costs" has occurred. Indeed, one would be hard pressed to come up with an alternative method to identify the shifting of costs from one entity to another.

Petitioner advances three separate arguments for not deferring to the Secretary's interpretation of the anti-redistribution clause. None is persuasive.

First, petitioner asserts that the "clear meaning" of the anti-redistribution clause is to allow reimbursement for the costs of activities traditionally carried on by hospitals (e. g., clinical training of residents and interns), but to deny reimbursement for costs incurred in activities traditionally carried on by educational institutions (e. g., classroom training). Pet. for Cert. 14. In other words, according to petitioner, the redistribution that is prohibited is the redistribution of activities, not the redistribution of costs. Brief for Petitioner 20.

This argument is mistaken, for it ignores the second clause of the critical sentence, which refers, on its face, to the "redistribution of costs," not the "redistribution of activities." The term "costs," moreover, is used without condition. Nothing in the plain language suggests that the prohibition on "redistribution of costs" is limited to the costs of certain activities (such as classroom instruction) carried on by an educational unit. The clear inference from the language is that the shift of any reimbursable costs from an "educational institutio[n] or uni[t]" to a "patient care institutio[n] or uni[t]" is prohibited. The Secretary's interpretation of the anti-redistribution principle is thus far more consistent with the regulation's unqualified language than the interpretation advanced by petitioner. But even if this were not so, the Secretary's construction is, at the very least, a reasonable one, and we are required to afford it "controlling weight." *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S., at 414.

Second, petitioner argues that the Secretary has been inconsistent in her interpretation of the anti-redistribution provision. While it is true that an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is " 'entitled to considerably less deference' than a consistently held agency view," *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446, n. 30 (1987) (quoting *Watt* v. *Alaska*, 451 U. S. 259, 273 (1981)), that maxim does not apply here because petitioner fails to present persuasive evidence that the Secretary has interpreted the anti-redistribution provision in an inconsistent manner.[3]

In an attempt to find an inconsistency, petitioner points to a 1978 internal operating memorandum issued by the Health Care Financing Administration (HCFA) that addressed the

---

[3] The dissent seeks to demonstrate that the Secretary has been inconsistent in her application of the community support principle. See *post*, at 520–522. We see no need to dispute that proposition; as indicated above, we express no view on the validity of the Secretary's interpretation of the community support clause.

reimbursement of costs incurred by medical schools affiliated with providers. Intermediary Letter No. 78–7 (Feb. 1978), App. to Pet. for Cert. 64a–66a. The intermediary letter detailed various categories and amounts of educational expenses incurred by affiliated medical schools that might be allowable to providers, but did not mention the antiredistribution limitation. Petitioner's attempt to infer from that silence the existence of a contrary policy fails because the intermediary letter did not purport to be a comprehensive review of all conditions that might be placed on reimbursement of educational costs. By its own terms, the intermediary letter attempted to review only a "number of situations" relating to the reimbursement of educational costs—namely, "situations rais[ing] questions about the reasonableness of [medical school faculty] costs as allowable hospital costs and the appropriateness of the bases used in allocating them to the hospital." *Id.*, at 64a. It is not surprising, then, that the letter did not address the antiredistribution principle, and the mere failure to address it here hardly establishes an inconsistent policy on the part of the Secretary.[4]

---

[4] Petitioner further relies on an exchange of memoranda within HCFA in 1982 regarding the University of Oregon's health training programs. App. 22–26. In response to an internal agency memorandum identifying the antiredistribution clause and requesting additional clarification on the scope of reimbursable educational activities, the Director of HCFA's Division of Institutional Services responded, in part, that "[t]he allocation of costs to a hospital from a related medical school is governed by Intermediary Letter 78–7," and failed to discuss the redistribution issue. *Id.*, at 25. This omission likewise fails to manifest a contrary policy. Indeed, a subsequent memorandum issued in 1985 from the Director of HCFA's Division of Hospital Payment Policy stated that "[t]he fact that [the redistribution issue] is not mentioned in the subject memorandum does not change the basic policy as espoused in 42 CFR [§ 413.85(c),]" which provides "that where costs for items and services were previously borne by a medical school, their allocation to a university hospital represents a redistribution of costs from an educational institution to a patient care institution." *Id.*, at 27.

Likewise, contrary to the dissent's suggestion, *post*, at 520–522, the mere fact that in 1974 a fiscal intermediary may have allowed reimbursement to petitioner for GME costs that appear to have violated the anti-redistribution clause does not render the Secretary's interpretation of that clause invalid. For even if petitioner could show that such allowance was approved by—or even brought to the attention of—the Secretary or her designate at the time, "[t]he Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation." *Good Samaritan Hospital* v. *Shalala*, 508 U. S. 402, 417 (1993). And under the circumstances of this case, "where the agency's interpretation of [its regulation] is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction." *Id.*, at 417.

Finally, petitioner contends that we should ignore the Secretary's interpretation of the anti-redistribution clause because the language of the regulation is "precatory" and "aspirational" in nature, and thus lacking in operative force. See Brief for Petitioner 31–32. We do not lightly assume that a regulation setting forth specific limitations on the reimbursement of costs under a federal program is devoid of substantive effect. That is especially so when, as here, the language in question speaks not in vague generalities but in precise terms about the conditions under which reimbursement is, and is not, available. Whatever vagueness may be found in the community support language that precedes it, the anti-redistribution clause lays down a bright line for distinguishing permissible from impermissible reimbursement: Educational costs will not be reimbursed if they are the result of a "redistribution of costs from educational institutions or units to patient care institutions or units." § 413.85(c). The Secretary was well within her discretion to interpret this language as imposing a substantive limitation on reimbursement.

In sum, the Secretary's construction of the anti-redistribution principle is faithful to the regulation's plain language, and the application of this language suffices to bar reimbursement of the costs claimed in this case. For these reasons, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE STEVENS, JUSTICE O'CONNOR, and JUSTICE GINSBURG join, dissenting.

The Court's opinion reads as if this were a case of model agency action. As the Court views matters, 42 CFR § 413.85(c) (1993) is "unambiguous," *ante*, at 514, and respondent Secretary of Health and Human Services (Secretary) has always been "faithful to the regulation's plain language," *ante* this page. That plain language, according to the Court, required the Secretary to disallow the reimbursement petitioner sought. The Court's account is hardly an accurate portrayal of this case. When the case is properly viewed, I cannot avoid the conclusion that the Secretary's construction of § 413.85(c) runs afoul of the plain meaning of the regulation and therefore is contrary to law, in violation of the Administrative Procedure Act, 5 U. S. C. § 706(2)(A). I therefore respectfully dissent.

## I

The Court holds that § 413.85(c) has substantive content, reasoning that "the language in question speaks not in vague generalities but in precise terms about the conditions under which reimbursement is, and is not, available." *Ante*, at 517. In my view, however, § 413.85(c) is cast in vague aspirational terms, and it strains credulity to read the regulation as imposing any restriction on the reimbursability of the costs of graduate medical education (GME) or other approved educational expenses. On the contrary, subsection (c) appears to be nothing more than a precatory statement of purpose that imposes no substantive restrictions.

Subsection (c), in stark contrast to the remainder of § 413.85, reads more like a preamble than a law. See *ante*, at 507–508, n. 1 (quoting § 413.85(c)).[1] In the community support portion of § 413.85(c), the Secretary praises the benefits of approved educational programs and expresses a belief that communities "should" pay for such programs. The subsection then announces the Secretary's intention to support such activities "appropriately," limited only by the vague suggestion that at some point in the future a restructuring of fiscal priorities at the "community" level may obviate the need for federal support. The anti-redistribution principle is no less precatory than the community support principle. It states two "intent[ions]": first, to pay for the "customar[y] and traditiona[l]" educational activities of Medicare providers, and, second, to avoid reimbursing expenses that should be borne by educational institutions affiliated with teaching hospitals. I would not permit the Secretary to transform by "interpretation" what self-evidently are mere generalized expressions of intent into substantive rules of reimbursability. Cf. *Stinson* v. *United States*, 508 U. S. 36, 45 (1993) (an agency's interpretation of its own regulation cannot be sustained if " 'plainly erroneous or inconsistent with the regulation' ") (quoting *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945)). See also *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965).

We rejected a similar attempted transformation of precatory language in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). There, we addressed a claim that the "bill of rights" of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U. S. C. § 6010 (1976 ed. and Supp. III), created substantive rights in favor of the mentally retarded. The bill of rights provided, in part, that such persons "have a right to appropriate treat-

---

[1] Like the Court, *ante*, at 507–508, I refer to the last sentence of 42 CFR § 413.85(c) (1993) as the "anti-redistribution principle," and to the remainder of the subsection as the "community support principle."

ment, services, and habilitation" and that state governments "have an obligation to assure that public funds are not provided to any [noncomplying] institutio[n]." §§ 6010(1), (3). We held that the bill of rights did not have substantive effect: "§ 6010, when read in the context of other more specific provisions of the Act, does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of 'findings' and, as such, is too thin a reed to support the rights and obligations read into it by the court below." 451 U. S., at 19. Even though *Pennhurst* did not involve an agency regulation, its textual analysis suggests that it is unreasonable to give substantive effect to precatory, aspirational language—as would the Secretary's construction of 42 CFR § 413.85(c) (1993). Cf. *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 260 (1991) (SCALIA, J., concurring in part and concurring in judgment) (explaining that "deference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ").

Interestingly enough, for the first two decades of the Medicare program's operation, the Secretary's fiscal intermediaries, with her acquiescence (if not approval), gave § 413.85(c) precisely the same substantive effect as I would—none. During that entire period, the Secretary *never* invoked the subsection to deny reimbursement for previously unreimbursed costs, and providers were actually reimbursed for such costs despite § 413.85(c). Indeed, contrary to the Court's baffling assertion that "petitioner fails to present persuasive evidence that the Secretary has interpreted the anti-redistribution provision in an inconsistent manner," *ante*, at 515, one need look no further than petitioner's brief, see Brief for Petitioner 21–24, to find evidence of such interpretive inconsistency as to both the anti-redistribution and community support principles.

Petitioner received no Medicare reimbursement for any GME costs from 1966 to 1973. Even though the anti-

redistribution and community support principles were in effect for that entire period, see *ante*, at 507–508, n. 1, petitioner was awarded reimbursement *for the first time* in 1974, for salary-related GME costs. Because those GME costs were not paid for by Thomas Jefferson University Hospital (Hospital) prior to 1974, even the Secretary's opinion below finds, as a matter of fact, that they were borne, to a large extent, by Jefferson Medical College (Medical School) during that period. Cf. App. to Pet. for Cert. 32a (identifying public educational grants to the Medical School and Medical School tuition as sources for funding the Hospital's pre-1974 GME activities). Also, the funding for those costs that came from sources other than the Medical School (namely, hospital fees from charges to non-Medicare beneficiaries, see *ibid.*) did not come from Medicare and therefore constituted "community support." See App. to Pet. for Cert. 18a (the Secretary "views community support as any source of funding other than the Medicare program").

Yet under the Secretary's present interpretation of § 413.85(c), petitioner should never have received *any* GME cost reimbursement because it had not obtained such reimbursement from the beginning of the Medicare program. To the extent the Hospital's GME costs were previously borne by the Medical School, providing petitioner reimbursement for those costs violated the anti-redistribution principle, as presently construed. See *ante*, at 513 ("The Secretary interprets the regulation . . . to deny reimbursement for 'costs previously incurred and paid by a medical school'") (editorial revisions omitted). Indeed, the Provider Reimbursement Review Board (PRRB) explicitly recognized this fact, finding that, on the fiscal intermediary's interpretation of "redistribution" (adopted by the Secretary below), "[i]n 1974, the [Hospital] commenced shifting costs . . . to the Medicare program" and that "[a]dditional cost shifting occurred in 1984 when certain clerical costs of the Medical School were included in the [Hospital's] cost report." App.

to Pet. for Cert. 50a.[2]   Similarly, reimbursing petitioner for GME costs violated the community support principle, to the extent funding for such costs had been available previously from non-Medicare sources.   See *ante*, at 511 (where community support has been received, §413.85(c) "prohibits Medicare reimbursement").   Thus, the Court's statement that there is no "evidence that the Secretary has interpreted the anti-redistribution provision in an inconsistent manner," *ante*, at 515, appears to be wishful thinking: Petitioner has been routinely granted reimbursement which it should have been denied under §413.85(c), if the Secretary's current interpretation is correct.

I think it reasonable to conclude that in reimbursing petitioner since 1974 for GME costs not reimbursed from the inception of the Medicare program, the Secretary acted on the basis of an interpretation of §413.85(c) that attached no significance to a Medicare provider's failure in prior years to be reimbursed for, or to carry on its books, eligible educational costs.   This conclusion has significant support in the Secretary's roughly contemporaneous pronouncements. Cf. *Lyng* v. *Payne*, 476 U. S. 926, 939 (1986); *M. Kraus & Bros., Inc.* v. *United States*, 327 U. S. 614, 622 (1946) (opinion of Murphy, J.).   In 1978, for example, the Secretary advised fiscal intermediaries that reasonable GME costs incurred by a related medical school are "allowable hospital costs," Intermediary Letter No. 78–7 (Feb. 1978), without even mentioning either the community support or the anti-redistribution principle as potential limitations on its construction.   App. to Pet. for Cert. 64a.   The letter's explicit statement that the Secretary therein addressed the "appropriateness" of "allocating [educational costs] to the hospital [in question],"

---

[2] Because the Secretary, through the Health Care Financing Administration (HCFA), only modified rather than reversed the PRRB's decision, see App. to Pet. for Cert. 37a, the PRRB's opinion remains in force to the extent consistent with the opinion of the HCFA.   Cf. 42 U. S. C. §1395*oo*(f)(1).

*ibid.*, demonstrates the inaccuracy of the Court's suggestion that the letter addressed topics entirely unrelated to the anti-redistribution principle, *ante*, at 515–516; the "appropriateness" of allocating costs from a medical school to its affiliated hospital is precisely what the anti-redistribution principle governs, to the extent it has substantive effect at all. See 42 CFR § 413.85(c) (1993).

Moreover, in 1982, the Secretary answered a query from a fiscal intermediary concerning the relationship between the anti-redistribution principle and Intermediary Letter 78–7 with the statement that "allocation of costs to a hospital from a related medical school is governed by Intermediary Letter 78–7." App. 25. The Court makes much of the fact that the 1982 memorandum did not explicitly mention the anti-redistribution principle. *Ante*, at 516, n. 4. In so doing, however, the Court overlooks the fact that the fiscal intermediary's inquiry presented the Secretary with a specific binary choice: Are approved educational activities previously paid for by an affiliated educational unit either allowable (*i. e.*, reimbursable) hospital costs (as Intermediary Letter No. 78–7 advised) or a prohibited redistribution of costs under § 413.85(c)? By answering the fiscal intermediary's pointed query with the statement that Intermediary Letter No. 78–7 is controlling on the reimbursability of the costs associated with such activities, see App. 25, the Secretary quite clearly (albeit implicitly) afforded the anti-redistribution principle no substantive effect whatsoever.

To be sure, in 1985 the Secretary issued a memorandum stating, without elaboration, that "[t]he fact that [the anti-redistribution principle] is not mentioned in the [1982] memorandum does not change the basic policy as espoused in [§ 413.85(c)]." *Id.*, at 27. The 1985 memorandum's bare reference to the "policy" of § 413.85(c), however, neither disavowed the Secretary's past interpretation of the regulation nor set forth any alternative interpretation. The Court thus considerably overstates matters in its suggestion that

the 1985 memorandum specifically confirmed the continued vitality of the anti-redistribution principle. *Ante,* at 516, n. 4.[3]

Based on a reading of the undeniably precatory language used in § 413.85(c), confirmed by two decades of consistent agency practice, I would hold that subsection (c) imposes no limit on the reimbursability of approved educational activities. Cf. *M. Kraus & Bros.,* 327 U. S., at 622 ("Not even the Administrator's interpretations of his own regulations can . . . add certainty and definiteness to otherwise vague language"). Instead, the subsection seems intended merely to explain the remainder of the regulation, which addresses the reimbursability of approved educational costs in clear,

---

[3] Even less satisfactory is the Secretary's suggestion that her failure to apply § 413.85(c) in prior fiscal years is of no relevance. See Brief for Respondent 37. The prior inconsistent conduct of the agency is quite relevant—not because her inconsistency "estop[s]" her from changing her view, *ante,* at 517 (internal quotation marks omitted)—but rather because agency conduct, no less than express statements, can effect a construction of statutes or regulations. Cf., *e. g., Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 41–42 (1983) (holding that "[a] 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies [of applicable statutes or regulations]'") (quoting *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade,* 412 U. S. 800, 807–808 (1973)). Two decades of providing reimbursement in contravention of what is now claimed to be the community support and anti-redistribution principles certainly constitutes a "settled course of behavior," and I find it difficult to believe the Secretary would permit such a persistent—and costly—error in the application of her reimbursement rules. Cf. 1991 Medicare Explained ¶ 706, p. 179 ("When Medicare pays for noncovered services or it pays too much for covered services, the program will ordinarily attempt to recover the amount of the overpayment"). A settled interpretation that persists over time is presumptively to be preferred, see *Motor Vehicle Mfrs. Assn.,* 463 U. S., at 41–42, and therefore judges are properly suspect of sharp departures from past practice that are as unexplained as the Secretary's in this case. *Id.,* at 42. See also *Wichita Bd. of Trade, supra,* at 807–808.

unmistakably mandatory terms. Cf. *Pennhurst*, 451 U. S., at 19, n. 14.

By giving substantive effect to such a hopelessly vague regulation, the Court disserves the very purpose behind the delegation of lawmaking power to administrative agencies, which is to "resol[ve] . . . ambiguity in a statutory text." *Pauley* v. *BethEnergy Mines, Inc.*, 501 U. S. 680, 696 (1991). See generally *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 865–866 (1984). Here, far from resolving ambiguity in the Medicare program statutes, the Secretary has merely replaced statutory ambiguity with regulatory ambiguity. It is perfectly understandable, of course, for an agency to issue vague regulations, because to do so maximizes agency power and allows the agency greater latitude to make law through adjudication rather than through the more cumbersome rulemaking process. Nonetheless, agency rules should be clear and definite so that affected parties will have adequate notice concerning the agency's understanding of the law. Cf. *FTC* v. *Atlantic Richfield Co.*, 567 F. 2d 96, 103 (CADC 1977) (Wilkey, J.). Cf. generally 2 K. Davis & R. Pierce, Administrative Law § 11.5, p. 204 (3d ed. 1994) ("An agency whose powers are not limited either by meaningful statutory standards or . . . legislative rules poses a serious potential threat to liberty and to democracy"). The aspirational terms of § 413.85(c) are woefully inadequate to impart such notice.[4]

---

[4] As a result of the Court's ruling today, petitioner and other Medicare providers who, in the past, received reimbursement for GME costs in violation of the Secretary's present interpretation of § 413.85(c) are suddenly faced with the possibility of being sued for recoupment of the millions of dollars of "overpayments" they received from Medicare. The Social Security Act, we have noted, "permits . . . retroactive action" within three years by the Secretary to make " 'corrective adjustments . . . where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be . . . excessive.' " *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 209 (1988) (quoting 42 U. S. C. § 1395x(v)(1)(A)). Thus, although the Secretary per-

## II

### A

In view of its unbelabored conclusion that § 413.85(c) imposes substantive limits on the reimbursability of approved educational costs, the Court's discussion focuses primarily on what substantive import § 413.85(c)'s anti-redistribution principle should be read to have. The Court finds the anti-redistribution principle "straightforward" in its meaning—any costs that, at some previous point in time, were carried on the books of an affiliated educational institution cannot subsequently be reimbursed by Medicare. *Ante,* at 513. For the reasons previously discussed, I would hold that § 413.85(c) cannot reasonably be construed to impose substantive restrictions on the reimbursability of approved educational costs. Nevertheless, if I had to give the principle substantive effect, I could not agree with the Court's sweeping construction of the principle. In my view, the Court's reading is premised on a distortion of the text of the regulation enunciating the anti-redistribution principle, and it is the text, of course, which must be given controlling effect. See *Bowles,* 325 U. S., at 414 (holding that an agency's interpretation of its own regulation must comport with "the plain words of the regulation").

Under the relevant portion of § 413.85(c), it is the *type* of educational activity engaged in that determines whether or not reimbursement is proper: "[T]he intent of the [Medicare] program is to share in the support of educational activities customarily or traditionally carried on by providers in

mitted petitioner to recover reimbursement for "those medical education costs which it has traditionally claimed and been allowed prior to 1984," App. to Pet. for Cert. 37a, that act of administrative grace appears to be subject to revision at the whim of the Secretary. Cf. *Heckler* v. *Community Health Services of Crawford Cty., Inc.,* 467 U. S. 51 (1984) (Secretary not estopped from recouping overpayment to Medicare provider whose prior reimbursement claims were made in reliance on erroneous advice of its designated fiscal intermediary).

conjunction with their [patient care] operations." 42 CFR § 413.85(c) (1993). The proper question under the anti-redistribution principle, therefore, is not, as the Secretary puts it, whether "[a particular provider] has traditionally claimed and been allowed" reimbursement for a particular category of reimbursable costs. App. to Pet. for Cert. 37a. Instead, the relevant question is whether the educational activities for which reimbursement is sought are of a type "customarily or traditionally" engaged in by providers. If, in a particular case, that question is answered in the negative, then it would be a forbidden "redistribution" of costs to award Medicare reimbursement for the costs associated with the activities in question. Conversely, if the costs for which a provider seeks reimbursement result from educational activities that are traditionally engaged in by Medicare providers, no redistribution of costs occurs when those costs are reimbursed.

A prohibition against shifting the costs of educational units (for example, medical or nursing schools) to patient care units was necessary because of the Medicare program's related-organization rule, which provides that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider." 42 CFR § 413.17(a) (1993). In light of the related-organization rule, § 413.85(a)'s recognition of educational costs as reimbursable costs created the distinct possibility that many, if not most, of the costs arising from educational unit activities could be shifted to affiliated Medicare providers (and therefore to the Medicare program) because, by definition, such units engage in educational activities. Cf. 57 Fed. Reg. 43659, 43668 (1992) (expressing the Secretary's concern that "Medicare payment for medical education costs should not result in a redistribution of costs from the educational institution to the provider"). Since Medicare is primarily intended to fund health care for the elderly and

disabled, not to subsidize the education of health care professionals, cf. 42 U. S. C. § 1395c, the Secretary avoided such an inadvertent "expan[sion] [in] the range of items and services for which a provider could claim payment" by barring the redistribution of costs from educational to patient care units. 57 Fed. Reg. 43668 (1992).

The Court therefore errs in reading the term "redistribution" wholly divorced from the context in which it appears. See *ante*, at 513 (suggesting the first clause of the anti-redistribution principle is not even "relevant" to an understanding of the second phrase). In my view, "redistribution" can only be properly understood in light of the remainder of the sentence in which it appears and in light of the related-organization rule, because interpreting a statute or regulation "is a holistic endeavor." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988). Viewed in the proper textual context, § 413.85(c)'s anti-redistribution principle simultaneously expresses an intent to fund educational activities customarily conducted by teaching hospitals and disallows reimbursement for costs incurred by their affiliated educational units in conducting educational programs not customarily or traditionally engaged in by such hospitals. The Secretary's contrary interpretation, in my view, is unworthy of deference. Cf., *e. g., Bowles, supra,* at 414.

There can be no question that the GME activities for which petitioner seeks reimbursement are customarily or traditionally engaged in by teaching hospitals. As the District Court cogently explained in *Ohio State Univ.* v. *Secretary, U. S. Dept. of Health and Human Services,* 777 F. Supp. 582 (SD Ohio 1991), aff'd, 996 F. 2d 122 (CA6 1993), cert. pending, No. 93–696:

> "In the case of graduate medical education, it would be customary and traditional for a teaching hospital to employ qualified physicians in various medical specialties to select and supervise the interns and residents

enrolled in the educational program. These physicians would need clerical and administrative staff, office space and supplies to carry out their function[s]. Their salaries, the salaries of their clerical and administrative staffs, and the cost of their office space and supplies would all be part of the cost of the educational activity which ultimately contributes to the quality of patient care in the hospital." 777 F. Supp., at 587.

As a result, the anti-redistribution principle provides no basis for denying petitioner Medicare reimbursement for the full level of its GME costs, less tuition revenues. See §§ 413.85(a), (g).

I therefore wholeheartedly agree with the PRRB that "[t]he fact that [the Hospital] did not fully identify all of the costs associated with its GME programs in prior years does not prohibit the correction of this [cost accounting] error in the cost reporting period in contention." App. to Pet. for Cert. 58a–59a. In ruling to the contrary, the Court arbitrarily subjects similarly situated Medicare providers, with identical levels of reimbursable GME costs, to disparate reimbursement, simply because one provider may have forgone reimbursement to which it was plainly entitled as a consequence of its cost accounting procedure's failure to identify all of the provider's reimbursable costs. Although "[m]en must turn square corners when they deal with the Government," *Rock Island, A. & L. R. Co.* v. *United States,* 254 U. S. 141, 143 (1920) (Holmes, J.), the manifest injustice of the Court's result should be apparent.

### B

Because, unlike the Court, I do not believe the anti-redistribution principle may reasonably be read to bar petitioner's claim for reimbursement for non-salary-related GME costs, I must also address petitioner's challenge to the Secretary's construction of the community support principle. Petitioner argues that interpreting the term "community

support" to include all non-Medicare sources of funding for GME costs is inconsistent with the text of § 413.85(c). I agree. Not only is the community support principle merely an aspirational statement of policy, see *supra*, at 519–523, but, in my view, the other provisions of 42 CFR § 413.85 (1993) plainly leave no role for the principle in the cost reimbursement calculus for approved educational activities.

Section 413.85(a) authorizes a provider to "include its net cost of approved educational activities" in its allowable Medicare costs and provides that the "net cost" of such activities is to be "calculated under paragraph (g) of this section." Section 413.85(g), in turn, defines "[n]et cost of approved educational activities" as the provider's "total costs of these activities," less "revenues it receives from tuition." Section 413.85(g) therefore clearly establishes the level of reimbursement a provider may expect for approved educational costs, and the only source of funding that is to be offset against such costs is tuition revenues. No other potential sources of funding for GME activities are included in the offset required by § 413.85(g). Thus, the Secretary's interpretation of the community support principle as requiring, in effect, all non-Medicare sources of funding to be offset against total educational cost is flatly inconsistent with §§ 413.85(a) and (g).

The plain implication of § 413.85(g) is confirmed by its regulatory history. Cf. *Payne*, 476 U.S., at 941. In 1984, the Secretary amended the subsection's predecessor to eliminate the requirement that "grants" and "specific donations" be offset against educational costs actually incurred. See 49 Fed. Reg. 234, 296, 313 (1984) (amending 42 CFR § 405.421(g) (1983)). See also 48 Fed. Reg. 39752, 39797, 39811 (1983) (withdrawing 42 CFR § 405.423 (1982) relating to offsets for certain grants and gifts). The Secretary's construction of the community support principle essentially reintroduces grants and specific donations into the reimbursement calculus. The Secretary has thus rendered the 1984 amend-

ment to the regulation entirely superfluous, a disfavored result that should be avoided where possible. See *Kungys* v. *United States*, 485 U. S. 759, 778 (1988). Cf. also *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253 (1992).

Consequently, the Secretary's construction of the community support principle to impose a substantive restriction on the reimbursability of approved educational expenses is inconsistent with the regulation. As such, the construction is unworthy of deference. See, *e. g.*, *Stinson*, 508 U. S., at 45.

## III

For the foregoing reasons, the Secretary acted contrary to law, within the meaning of 5 U. S. C. § 706(2)(A), in construing 42 CFR § 413.85(c) (1993) as denying Medicare providers the right to receive reimbursement for otherwise eligible educational costs simply because the costs had not previously been reimbursed by Medicare. I would therefore reverse the judgment of the Court of Appeals. I respectfully dissent.