**DISTRICT MEMORIAL HOSPITAL OF SOUTHWESTERN NORTH CAROLINA, INCORPORATED, Plaintiff–Appellee,**

**v.**

**Tommy G. THOMPSON, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, in his official capacity, Defendant–Appellant.**

**No. 03–1401.**

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 20, 2004.

Decided: April 12, 2004.

**ARGUED:** Mark Simon Davies, Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C., for Appellant. Susan McNear Fradenburg, Smith Moore, L.L.P., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Robert J. Conrad, Jr., United States Attorney, Scott R. McIntosh, Attorney, Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C., for Appellant. Maureen Demarest Murray, Smith Moore, L.L.P., Greensboro, North Carolina, for Appellee.

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge King and Judge Duncan joined.

NIEMEYER, Circuit Judge:

The Secretary of Health and Human Services denied District Memorial Hospital of Southwestern North Carolina, Inc., a special reimbursement that is available under the Medicare program to hospitals providing inpatient *acute care* to a "significantly disproportionate number of low-income patients." This special reimbursement is known as the "disproportionate share adjustment." Because District Memorial Hospital used its beds to provide both *acute care* and *nursing care,* when determining whether the hospital qualified for the adjustment, the Secretary applied regulation 42 C.F.R. § 412.106 (1988) to exclude from the eligibility calculation these dual-use beds—known as "swing beds"—whenever they were used to provide *nursing care.*

The district court, reviewing the Secretary's determination on cross-motions for summary judgment, found that the Secretary misconstrued and misapplied regulation § 412.106. The court concluded that the regulation is "clear" and "admits of only one meaning"—the meaning advanced by District Memorial Hospital to justify its claim for reimbursement of the disproportionate share adjustment. Accordingly, the court remanded the matter to the Secretary "for the prompt payment" to the hospital of $615,607 plus interest.

Because we conclude that regulation § 412.106 is ambiguous and that the Secretary's interpretation is a reasonable construction of the regulatory language, *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 506, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), we defer to the Secretary and reverse.

I

The Medicare program finances health care for the elderly and the disabled. *See* 42 U.S.C. § 1395c. Until 1983, the program reimbursed hospitals for the "reasonable cost" of inpatient services rendered to Medicare patients. In 1983, Congress overhauled the program and began reimbursing the cost of inpatient *acute care* under a "prospective payment system." The prospective payment system reimburses hospitals at fixed rates that are based on the patient's diagnosis upon discharge. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149–72 (1983). The fixed rates are established by determining what an efficient hospital would spend to treat a patient with that diagnosis. Under the 1983 overhaul, expenses incurred for *skilled nursing care* continue to be reimbursable under the old "reasonable cost" basis, which is generally more desirable for hospitals because reimbursement is not limited by a fixed-rate schedule.

When adopting the prospective payment system in 1983, Congress recognized that the fixed rates established under that system could undercompensate hospitals that treated a high proportion of low-income Medicare patients, because those patients were thought generally to be in poorer health and would require more services than would higher-income patients. *See* H.R.Rep. No. 98–25(I), at 141–42 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 360–61. Accordingly, Congress instructed the Secretary to formulate an adjustment to the fixed rates to increase the reimbursement to those hospitals that served a significantly disproportionate number of low-income patients—the "disproportionate share adjustment." When the Secretary delayed publishing a formulation, Congress itself set forth the criteria in 1986 for this disproportionate share adjustment. *See* 42 U.S.C. § 1395ww(d)(5)(F). The Secretary thereafter published the regulation at issue in this case, construing and implementing the congressional enactment. *See* 42 C.F.R. § 412.106 (1988).

The 1988 regulation provided that, in determining a hospital's disproportionate share adjustment, the relevant factors were the hospital's number of available beds, its number of "patient days," and its location. 42 C.F.R. § 412.106(a) (1988). The hospital's number of patient days was defined to include "only those days attributable to areas of the hospital that [were] subject to the prospective payment system and exclude[d] all others." *Id.* § 412.106(a)(ii). Because eligibility for the disproportionate share adjustment was based on the number of patient days attributable to "areas of the hospital that [were] subject to the prospective payment system"—i.e., areas providing inpatient acute care—eligibility for the adjustment for hospitals providing both acute care and nursing care depended on how the Secretary interpreted the regulation to define

the areas where acute care was being performed. The Secretary's interpretation was especially critical with respect to hospitals providing both acute care and skilled nursing care at the same beds.

Distinguishing between "areas of the hospital subject to the prospective payment system" and those subject to reasonable-cost reimbursement presented no problem so long as the hospital was divided into distinct wings, each of which provided only one form of care—either acute care or skilled nursing care. And before 1980, the provision of those two types of care was in fact generally divided. Skilled nursing services were generally rendered in facilities that were separate and distinct from hospitals providing acute care. Moreover, in areas where acute care and skilled nursing care were provided in the same facility, Medicare required that hospitals provide skilled nursing care in a "distinct part" of the hospital, such as a building, floor, wing, or corridor that was physically separate from the inpatient acute care unit. *See* Rural Hospitals: Provision of Long–Term Care Services (Swing–Bed Provision), 47 Fed.Reg. 31,-518, 31,518 (July 20, 1982) ("A distinct part ... must be an entire physically identifiable unit consisting of all the beds within that unit (such as a separate building, floor, wing, or corridor) ... ").

In the 1970s, the Secretary recognized that this model of separate facilities for different types of care was difficult for small rural hospitals to achieve, given their limited physical resources. The Secretary found that rural areas generally had an excess of hospital beds for acute care and a shortage of beds for skilled nursing care because of a shortage of nursing homes. To respond to this, Congress authorized the Secretary to enter into agreements with rural hospitals with fewer than 100 beds that allowed them to use their inpatient acute care facilities also for services

of the type that would be provided at skilled nursing facilities. 42 U.S.C. § 1395tt(a)(1), (b). With the Secretary's approval, a rural hospital could accordingly use any inpatient bed for either inpatient acute care or skilled nursing care. These beds, known as "swing beds," were thus licensed for acute care but were able to "swing" to use for nursing care when not needed for acute care. Although acute care and nursing care could now be performed in the same facility, their reimbursement systems were still separate: swing-bed skilled nursing care was reimbursed on the reasonable cost basis, and acute care remained under the prospective payment system. *Id.* § 1395tt(a)(2).

Because the distinction in methods of reimbursement depended on the nature of services rendered and because only the prospective payment method was linked with the disproportionate share adjustment, the Secretary construed regulation 42 C.F.R. § 412.106, which was promulgated to calculate the disproportionate share adjustment, to exclude from the calculation any patient day that was attributable to a swing bed providing skilled nursing care. This became the long-standing interpretation applied by the Secretary.

District Memorial Hospital is a small (under 100 beds) rural hospital in Andrews, North Carolina, that had a swing-bed agreement with the Secretary. Consequently, its beds were licensed for acute care but could be used for either acute care or skilled nursing care, as needed.

In its 1991–97 cost reports, District Memorial Hospital claimed the disproportionate share adjustment authorized by 42 U.S.C. § 1395ww(d)(5)(F)(i)(I), in the amount of $615,607, asserting that it served a significantly disproportionate number of low-income patients. In performing the calculations required by regulation § 412.106, the hospital included as

"patient days" the days on which its patients received skilled nursing services in its swing beds because the beds were physically located in an area licensed for acute care. Under the Secretary's standing construction of § 412.106, however, the Secretary's intermediary excluded these days from the calculation, and as a result, District Memorial Hospital failed to qualify for the disproportionate share adjustment. Accordingly, on October 5, 1998, the intermediary denied the hospital's claim for the disproportionate share adjustment.

The hospital appealed the intermediary's decision to the Provider Reimbursement Board, and the Board reversed the intermediary's decision, awarding the hospital the disproportionate share adjustment. The Board's decision was thereafter reviewed on behalf of the Secretary by the Deputy Administrator of the Centers for Medicare & Medicaid Services (formerly the Health Care Financing Administration). On August 27, 2001, through the Deputy Administrator, the Secretary reversed the Board and concluded that there was a "clear statutory intent" to treat swing-bed hospitals in a manner similar to independent skilled nursing facilities, and therefore such hospitals generally were not entitled to the disproportionate share adjustment. The Secretary determined that the adjustment was available only for inpatient acute care beds that were subject to the prospective payment system.

The hospital sought judicial review of the Secretary's decision by commencing this action in the district court. Ruling on cross-motions for summary judgment, the district court reversed the Secretary and held that District Memorial Hospital was entitled to the disproportion-ate share adjustment. *Dist. Mem'l Hosp. v. Thompson*, 261 F.Supp.2d 378, 388 (W.D.N.C. 2003). In its judgment dated February 3, 2003, the court remanded the case to the Secretary for "the prompt award of the amount in controversy plus interest pursuant to 42 U.S.C. § 1395oo(f)(2)." In rejecting the Secretary's arguments, the district court stated that regulation § 412.106(a) was "plain on its face and permit[ted] the exclusion of patient days only if those days [were] attributable to *geographic areas* of the hospital—to beds in a particular part of the hospital—that [were] excluded from [the prospective payment system]." *Dist. Mem'l Hosp.*, 261 F.Supp.2d at 383 (emphasis added). The court rejected the Secretary's argument that the word "areas" in context meant to cover only "those patient days involving inpatient hospital services that could be covered under [the prospective payment system]." *Id.*

From the district court's judgment in favor of District Memorial Hospital, the Secretary appealed.

## II

We review the district court's summary judgment *de novo* and apply the same standard that it was required to apply to review the Secretary's interpretation of the Department of Health and Human Services' regulation. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127–28 (4th Cir.1987).

 In considering the Secretary's construction of 42 C.F.R. § 412.106, we give "substantial deference to [the] agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). More precisely, "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945))). Indeed, the Supreme

Court has noted that deference to the Secretary's interpretations of Medicare regulations is "all the more warranted," because Medicare is "'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)). The agency's interpretation "need not be the best or most natural one by grammatical or other standards." *Pauley*, 501 U.S. at 702, 111 S.Ct. 2524. Rather, it need only be "*a* reasonable construction of the regulatory language." *Thomas Jefferson Univ.*, 512 U.S. at 506, 114 S.Ct. 2381 (emphasis added).

Regulation § 412.106(a)(1), which is at issue in this case, provides:

> The factors considered in determining whether a hospital qualifies for a payment adjustment include the number of beds, the number of patient days, and the hospital's location.
>
> (i) The number of beds in a hospital is determined in accordance with § 412.105(b).
>
> (ii) *The number of patient days includes only those days attributable to areas of the hospital that are subject to the prospective payment system and excludes all others.*
>
> (iii) The hospital's location, in an urban or rural area, is determined in accordance with the definitions in § 412.62(f).

42 C.F.R. § 412.106(a)(1) (1988) (emphasis added).*

■ The regulation itself is not being challenged by District Memorial Hospital. Nor does any party dispute that all skilled nursing services—including those rendered in "swing beds"—are reimbursed under the "reasonable cost" system, not under the prospective payment system. *See* 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.1(a)(2)(ii)(B). The question presented is whether the Secretary may construe and apply regulation § 412.106 to exclude, in determining the disproportionate share adjustment, the days that patients spent in the hospital's swing beds receiving skilled nursing care and count only the number of days that patients spent in swing beds receiving acute care, which is subject to the prospective payment system.

District Memorial Hospital contends that, in calculating the disproportionate share adjustment, it may include patient days "attributable to *areas* of the hospital that were subject to the prospective pay system," which in its case included all beds in the hospital. It argues that patient days attributed to any bed licensed for acute care must be included in the calculation, regardless of how the bed is actually used under the swing-bed arrangement. According to the hospital, regulation § 412.106 authorizes the disproportionate share adjustment based on "where a bed is located, not on what basis the hospital receives reimbursement for the beds." Because all beds at District Memorial Hospital are located "in the physical area of the hospital subject to the prospective payment system," they must be included in the calculation of patient days. When they are so included, the hospital states, it qualifies for the adjustment. The hospital ar-

---

* To resolve the ambiguity at issue in this case, § 412.106 was amended in 2003 to read in relevant part:

> For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with ... skilled nursing swing-bed services (4)27

42 C.F.R. § 412.106(a)(1)(ii) (2003).

gues that its "temporary use" of beds for nursing care in the area licensed for acute care is "irrelevant," because geographical area, not function, governs reimbursement of the adjustment. The district court agreed with the hospital and ordered that it be paid the disproportionate share adjustment.

The Secretary, on the other hand, presses a non-geographical reading of the term "areas," arguing that the term refers to the scope of activity—in this case, the provision of acute care—rather than to all beds geographically located in a hospital wing licensed to provide acute care. Under the Secretary's construction, acute care services would be compensated under the prospective payment system as enhanced by the disproportionate share adjustment, wherever and whenever acute care services were provided, and nursing care services would be compensated under the reasonable cost system, wherever and whenever they were provided. The Secretary argues that District Memorial Hospital's expenses for skilled nursing care are reimbursed adequately by the Medicare program under the "reasonable cost system," and to make an additional award of the disproportionate share adjustment, which was designed to enhance only the fixed rate payments for acute care, would amount to a "significant financial windfall at the expense of the Medicare program." The Secretary notes that such a windfall would not be made if the Secretary's longstanding interpretation of regulation § 412.106 were followed. The Secretary argues that the district court failed to show the proper level of deference to his interpretation of regulation § 412.106 by erroneously applying a standard of review that would evaluate whether his interpretation was consistent with the "ordinary" meaning of the regulation's text, rather than whether the Secretary's interpretation was "a reasonable construction."

We find that neither party's interpretation of regulation § 412.106 is clearly beyond the plain meaning of the regulation's text and that the term "areas" is ambiguous. We therefore conclude that the Secretary's interpretation is at least *a* reasonable construction of the regulatory language. The word "area" may refer to a physical space, a geographical area, as found by the district court, or it may refer to "the sphere or scope of operation or action." Webster's Third New International Dictionary 115 (1993). Thus, employing this alternative definition, someone may say, "I practice in the *area* of Medicare law." Under this alternative definition, "areas of the hospital that are subject to the prospective payment system" would encompass activities that are defined by whether they are reimbursed under the prospective payment system, regardless of where the activities geographically took place. In other words, "days attributable to areas of the hospital that are subject to the prospective payment system" would mean "days attributable to hospital activities that involve acute care and therefore are reimbursed under the prospective payment system." While it is true that this interpretation relies on an alternative definition of "area," an agency's interpretation "need not be the best or most natural one by grammatical or other standards." *Pauley,* 501 U.S. at 702. Rather, it need only be *a* reasonable construction. *Thomas Jefferson Univ.,* 512 U.S. at 506, 114 S.Ct. 2381.

Even if one were to insist that the word "area," as used in regulation § 412.106, be read to carry its geographical connotation, the Secretary's interpretation would remain a reasonable construction of the regulatory language. The word "area" would then refer to the location of any bed used to provide *acute care* when such services were being provided, and the dispropor-

tionate share adjustment would apply to that location at such times. Similarly, the word "area" would not refer to the location of a bed when *skilled nursing services* were being provided at that bed because such services were not "subject to the prospective payment system." Under this interpretation, the word "areas" in a geographical sense would be referring to the locations of individual beds, as opposed to wings or units of the hospital. Use of this meaning would result in the same interpretation advanced by the Secretary, who counted "patient days" when beds were actually being used for acute care. Although the reimbursement status of each swing bed might thus change daily, as the use of the bed shifted between acute care and skilled nursing care, such a daily reassessment would be consistent with the regulatory language, which refers to *"days* attributable to areas of the hospital that are subject to the prospective payment system." 42 C.F.R. § 412.106(a)(1)(ii) (1988).

Not only do we conclude that the Secretary's interpretation is a reasonable construction of the regulatory language, we also conclude, as did the district court, that the Secretary's interpretation more closely fits the policy considerations underlying the regulation than does the hospital's interpretation. The disproportionate share adjustment was authorized to correct for the undercompensation that resulted from the fixed rates of the prospective payment system used for acute care in locations where the hospital had a substantially disproportionate share of low-income patients. It was not intended to be an enhancement for reimbursement under the reasonable cost system. Because skilled nursing services were already fully reimbursed on a reasonable cost basis—a system that was more favorable to the hospital than the prospective payment system— construing the regulation in a manner that would grant the disproportionate share ad-

justment to District Memorial Hospital for skilled nursing services performed in swing beds would result in overcompensation to the hospital—i.e., reimbursement for reasonable costs *plus* an adjustment above the reasonable costs.

In response to the Secretary's argument that his interpretation of regulation § 412.106 fulfills the policy behind the disproportionate share adjustment, District Memorial Hospital argues that Congress never intended that the disproportionate share adjustment be given only in connection with the prospective payment system for acute care. To make such an argument, however, District Memorial Hospital would have to be challenging the regulation itself, rather than the Secretary's interpretation of the regulation, because the regulation draws an unequivocal connection between the prospective payment system and the disproportionate share reimbursement. *See* 42 C.F.R. § 412.106(a)(1)(ii) (1988). Yet District Memorial Hospital did not make this argument either before the administrative agency or before the district court, and we will not entertain it for the first time on appeal. *See Pleasant Valley Hosp., Inc. v. Shalala,* 32 F.3d 67, 70 (4th Cir.1994).

In sum, we conclude that the Secretary's interpretation of 42 C.F.R. § 412.106(a) (1988) is "a reasonable construction of the regulatory language" and therefore must be given "controlling weight." *Thomas Jefferson Univ.,* 512 U.S. at 506, 512, 114 S.Ct. 2381. Accordingly, we reverse the judgment of the district court.

*REVERSED*