Louis KUSTER et al., Plaintiffs,

v.

Ann VENEMAN, Secretary of the United States Department of Agriculture; and Phyllis W. Honor, Acting Administrator, Risk Management Agency, Defendants.

No. CIV. A2–01–46.

United States District Court,
D. North Dakota,
Northeastern Division.

Aug. 1, 2002.

---

**3.** To the extent the plaintiff in passing asserts other arguments for reversal, I deny those as well.

Sarah M. Vogel, Courtney Koebele, Damian J. Huettl, Wheeler Wolf Law Firm, Bismarck, ND, for Plaintiffs.

Cameron W. Hayden, U.S. Atty's Offfice, Bismarck, ND, Kim Arrigo, U.S. Dept. of Agriculture Office of General Counsel, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

### I. Introduction

The Court has previously denied plaintiffs' motion for a preliminary injunction (doc. # 4), and it will now address the parties' dispositive motions. The government moves to dismiss or, alternatively, it seeks summary judgment (doc. # 20). Plaintiffs have moved for partial summary judgment (doc. # 23).

Plaintiffs are a group of farmers who purchased or attempted to purchase a crop revenue coverage ("CRC") insurance policy for their durum wheat during the 2001 crop year.[1] This type of coverage insures against revenue losses due to low yield and/or low price. Defendants are the Secretary of the United States Department of Agriculture ("USDA") and the Secretary of the Risk Management Agency ("RMA"),

---

1. Herein, the Court will refer to the policy at issue as simply "the policy.

the agency of the USDA that supervises the Federal Crop Insurance Corporation ("FCIC").[2]

Briefly stated, plaintiffs challenge the government's conclusion that a base price for durum wheat could not be established without an illegal amendment to the policy. This conclusion ultimately led to the cancellation of the policy; plaintiffs also challenge this decision. Finally, plaintiffs contend that these actions constitute a violation of due process.

## II. Jurisdiction

The government provides three bases for its motion. The first two implicate the Court's jurisdiction, and the Court will address them first.

### A. *Exhaustion*

██ The government contends that plaintiffs have failed to exhaust administrative remedies with the National Appeals Division ("NAD") pursuant to 7 U.S.C. § 6912(e). This section provides:

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against—
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

Plaintiffs contend, and the government does not dispute, that this case involves a legal challenge to generally applicable agency action. For this reason, plaintiffs argue that exhaustion requirements do not apply. It is true that matters of general applicability are not subject to NAD appeal. 7 U.S.C. § 6992(d). The decision, however, as to whether a matter is gener-

ally applicable is itself a matter that the Director of NAD must decide:

> If an officer, employee, or committee of an agency determines that a decision is not appealable and a participant appeals the decision to the Director, the Director shall determine whether the decision is adverse to the individual participant and thus appealable or is a matter of general applicability and thus not subject to appeal. The determination of the Director as to whether a decision is appealable shall be administratively final.

7 U.S.C. § 6992(d); *see also Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 95 (2d Cir.1998). Notwithstanding this requirement, to require exhaustion in this case would be fruitless. The Court rejected the government's identical exhaustion argument in *Wiley*, which also involved a legal challenge to a generally applicable agency action:

> Since this claim features purely legal questions which require no agency fact-finding, none of the purposes of the exhaustion requirement would be served by requiring plaintiffs to submit the claim to NAD.

*Wiley v. Glickman*, 1999 WL 33283314 at *2 (D.N.D. Apr.7, 1999). Thus, since the precedent set in *Wiley* dictates that exhaustion is not required and the government has not offered any viable reason to overturn this precedent, the government's motion to dismiss on this basis is **DENIED**.

Relatedly, plaintiffs seek to amend their complaint to add a claim under 7 U.S.C. § 6994 (doc. # 35). This section requires that participants who receive an adverse decision be provided notice of their rights with the National Appeals Division ("NAD"). Since plaintiffs are not required to exhaust remedies with NAD, plaintiffs' motion to amend by adding a claim under 7 U.S.C. § 6994 is **DENIED** (doc. # 35).[3]

---

**2.** Defendants will be referred to as "the government" throughout.

**3.** The proposed first amended complaint also seeks to remove James Diepolder as a plaintiff. This request is GRANTED.

### B. *Anti-injunction*

The government claims that it is immune from suit since plaintiffs essentially seek an injunction, and 7 U.S.C. § 1506(d) prohibits injunctions against the FCIC. The particular provision upon which the government relies provides:

> The [Federal Crop Insurance] Corporation, subject to the provisions of section 1508(j) of this title, may sue and be sued in its corporate name, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property.

7 U.S.C. § 1506(d).

■ Again, the Court denied the government's identical argument in *Wiley.* There, the Court held that the FCIC anti-injunction provision does not prohibit the Court from enjoining any action which might exceed its authority. *Wiley,* 1999 WL 33283314 at *2. Here, plaintiffs clearly allege that the government exceeded its authority by cancelling the CRC durum contracts. So, for the reasons articulated in *Wiley,* this attack on the Court's subject matter jurisdiction is **DENIED.**

### III. Agency action

Having denied the government's jurisdictional challenges, the Court reaches the determinative issue in this litigation: whether the government's interpretation of the formula used to determine the base price was either arbitrary or capricious.

### A. *Background*

#### 1. *Key policy and endorsement provisions*

Before addressing the specifics of the formula, the Court will briefly highlight key provisions contained in the policy at issue and in the endorsement attached to and made part of the policy. The endorsement set forth a formula for determining the base price, and it stated that a base price would be determined by March 10, 2001. The policy provided that any change to it would be made by December 31, 2000. Finally, the policy stated that either the insured or the insurer could cancel the policy at any time before the cancellation date, which was March 15, 2001.

#### 2. *Base price formula*

That there is a dispute regarding the base price provision is understandable, given the complex formula from which the base price is derived. Trades of durum wheat futures contracts at the Minneapolis Grain Exchange ("MGE") provide the input for the pricing formula. The base price for durum wheat is defined in the policy endorsement as: "The February harvest year's average daily settlement price for the harvest year's MGE September durum wheat futures contract rounded to the nearest whole cent." (Hoffman Aff., Exh. 1 at 292.) The average daily settlement price is the average of "all the daily settlement prices for the [September durum wheat futures contract]," [4] which must include at least fifteen days, each of which must be a "full active trading day." [5] (*Id.*

---

**4.** The bracketed portion of the quote, "September durum wheat futures contract" is used in place of "the contract specified in the applicable Base Price or Harvest Price definition." All parties agree that in this case "the contract specified in the applicable Base Price or Harvest Price definition" is the September durum wheat futures contract. For the sake of clarity, the Court will replace these terms throughout.

**5.** A "full active trading day" is "any day on which there are twenty-five (25) or more open interest contracts of the contract specified in the Base Price or Harvest Price Definition [September durum wheat futures contract]." (Hoffman Aff., Exh. 1 at 290.)

at 290.)

In other words, the policy endorsement mandated that there had to be a minimum number of February trades on the September durum wheat futures contract in order to establish a base price. In 2001, trading in February on the September durum wheat futures contract was thin and, consequently, there was an insufficient number of full active trading days to calculate a price based upon the definition of base price in the endorsement. The policy endorsement, however, provided an alternative calculation:

> If there are less than fifteen (15) full active trading days for [the September durum wheat futures contract], during [February] [6], then additional daily settlement prices, established on full active trading days, for the contract immediately prior to [the September durum wheat futures contract], during [February], will be used until there are fifteen (15) prices from fifteen (15) full active trading days included in this average.

*(Id.)*

The contract immediately prior to the September durum wheat futures contract, according to all parties, is the July contract. In 2001, however, even with the additional daily settlement prices from July, there were still less than 15 full active trading days with which to calculate the base price. The government thus contends that since the September and July futures contracts for durum wheat were

trading in such a low volume, no viable base price could be calculated under the terms of the policy. Based on this conclusion, on March 5, 2001, the RMA issued a bulletin which stated that: (1) it was unable to calculate a base price; and (2) no further polices could be sold after March 6, 2001.

Plaintiffs do not dispute the government's contention that data from the July and September futures contracts alone is insufficient to establish a base price, Plaintiffs argue, however, that the language of the policy endorsement does not restrict the contract from which the trading days are taken to just the July futures contract. Thus, the dispute in this case boils down to the agency's interpretation of the above-quoted alternative calculation for determining a base price.

### B. *Standard of review*

The level of deference, or standard of review, of the agency's action must be established in order to analyze the government's actions in this case. The level of deference given the disputed agency action turns on what type of action a court is reviewing. Here, plaintiffs assert that the government's interpretation of the policy endorsement and subsequent order to cancel the policy was arbitrary and capricious.

By framing their complaint in this way, plaintiffs acknowledge that the policy endorsement at issue is a regulation promulgated by an administrative agency.[7] That

---

**6.** February is used in place of "the month specified in the applicable Base Price or Harvest Price definition" since all parties agree that February is indeed the month specified in the applicable Base Price or Harvest Price definition." For the sake of clarity, the Court will make this replacement throughout.

**7.** Plaintiffs spend a considerable amount of time attacking the government's interpretation of the policy based not upon administrative law principles but, instead, upon contract

principles. It is true that in a contract case, the Court would apply and defer to contract law. Plaintiffs, however, have not alleged a contract claim, and thus the Court is not bound by contract principles. Nevertheless, even applying contract interpretation principles to plaintiffs' claims, the Court concludes that plaintiffs' claims fail. As explained herein, the Court finds that the government's interpretation of the disputed policy provision comports with the plain language of the provision.

the policy endorsement is a regulation, a rule issued by an administrative agency, is supported by the process leading up to approval of the policy. The Federal Crop Insurance Act provides that any person "may prepare for submission or propose to the Board [of the Federal Crop Insurance Corporation]: (A) other crop insurance policies and provisions of policies; and (B) rates of premiums for multiple peril crop insurance pertaining to wheat, soybeans, filed corn, and any other crops determined by the Secretary." 7 U.S.C. § 1580(h)(1).

Under the Act, American Agrisurance, Inc. submitted a formula to determine the base price to the Board. The Board approved this formula, which it then published in the Federal Digest as the "Commodity Exchange Endorsement—Wheat." *See* 65 Fed.Reg. 41,937. The policy incorporated this new formula for calculation of the base price. Plaintiffs do not dispute the validity of the underlying regulation— the policy and its endorsement. Instead, they dispute the government's interpretation of the regulation.

The Supreme Court has held that courts must give controlling weight to the agency's interpretation of its own regulation, unless the regulation violates the Constitution or a federal statute or is "plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). This is an exceptionally deferential standard. *City of St. Louis v. Dep't of Transp.*, 936 F.2d 1528, 1535 n. 1 (8th Cir.1991) ("Interpretation of the agency's regulation is, in most cases, best left to the agency itself, and the deference we give an agency's interpretation of its own rules is even greater than the deference due its interpretation of its governing statute."). Accordingly, the Court will accord all due deference to the govern-

ment's interpretation of the policy and its endorsements. *Id.*

### C. *Interpretation of base price formula*

In order to analyze properly plaintiffs' claim, the disputed policy endorsement provision bears repeating:

> If there are less than fifteen (15) full active trading days for [the September durum wheat futures contract], during [February], then additional daily settlement prices, established on full active trading days, for the contract immediately prior to [the September durum wheat futures contract], during [February], will be used until there are fifteen (15) prices from fifteen (15) full active trading days included in this average.

As explained above, plaintiffs and defendants have differing interpretations of this provision. Plaintiffs focus on the terms "will" and "until" in the policy, contending that the provision requires that trading days from prior contracts *will* be used "*until* there are fifteen (15) prices from fifteen (15) full active trading days."

The government argues, however, that such a reading takes the policy completely out of context; the full language of the provision provides that "additional daily settlement prices, established on full active trading days, for *the contract immediately prior to [the September durum wheat futures contract ]*, ... will be used until there are fifteen (15) prices from fifteen (15) full active trading days." (emphasis added). The government asserts that plaintiffs' reading would require the term "contract" to be plural and the term "immediately" to be stricken. The government additionally argues that the March contract, the contract from which the plaintiffs urge the government to use trading days, is not "the contract immediately prior to the contract specified in the applicable Base Price or Harvest Price defini-

tion;" only the July contract meets this definition.

It is clear from the papers submitted by the government that it devoted a considerable amount of time to proposing alternative ways to interpret the language of the policy. In the final analysis, though, the government determined that no other interpretation, other than the one reached, was cognizable.

■ After a careful reading of the disputed language, the government's interpretation of the disputed language seems entirely reasonable and, for that matter, correct. The "will be used until" language upon which plaintiffs rely only provides the answer to the question of when and how daily settlement prices are to be used; it simply cannot be read to provide an independent directive to use other prior contracts until fifteen full active trading days are established. The Court additionally finds that the term "immediately prior" restricts the number of prior contracts to one; to read this provision otherwise would render the term "immediately" superfluous.[8] Finally, as correctly pointed out by the government, only one contract, the July contract, could be classified as "the contract immediately prior to [the September durum wheat futures contract]." However, the March contract, which plaintiffs urge the government to consider is the contract immediately prior to the contract immediately prior to the contract "immediately prior to [the September durum wheat futures contract]."

Not only does the plain language of the endorsement support the government's interpretation, other considerations do as

well. Optimally, a base price is used to reflect current market conditions. Here, the drafters of the base price formula attempted to mirror current market conditions by requiring that the base price be calculated using data gained from futures trades on the Minneapolis Grain Exchange. Plaintiffs' interpretation of the base price formula would not accurately reflect current market conditions, since it requires that the calculation of the base price should include trades on March contracts, which are based on the previous year's crop.

Upon consideration of the above, it was not plainly erroneous, and in fact it seems entirely proper, to limit the calculation of the base price to the two preceding contracts. Thus, the agency's interpretation of its own regulation must be upheld. *University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (quoting *Bowles,* 325 U.S. at 414, 65 S.Ct. 1215) ("[The Court's] task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'").

### D. *Cancellation of contracts*

Before delving into the merits of plaintiffs' claim that the government's action to cancel the contracts was improper, it is important to revisit the decision in *Wiley,* since both parties rely on it to support their positions. In *Wiley,* farmers applied or intended to apply for a CRC policy, and the last day to change provisions in the

---

**8.** Plaintiffs rely on the following provision in the policy to support their argument that more than one prior contract should be used: "Throughout this policy, ... unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the single form of the word includes the

plural." Plaintiffs' argument on this point would seem formidable, except the phrase "unless the context indicates otherwise" destroys their argument. The use of the word "immediately" adjacent to the term "prior" indicates that the term "contract" was meant to remain singular.

policy was December 31. In *Wiley*, after the contract change date, the RMA lowered the minimum price guarantee. The Court held that such action constituted an illegal amendment to the policy, and thus the government's action was arbitrary and capricious. The lesson to be learned from *Wiley*, then, is that the RMA may not make any changes to the policy provisions after the contract change date.

In the present case, the government discovered that the formula built into the policy could not produce a viable base price in February 2001. However, by this time, the contract change date of December 31, 2000, had already passed. The government was in a difficult position; if it decided to "borrow" trading days in contravention of the language of the policy, then it could be subject to suit for unlawful amendment of the policy.[9] Thus, the government had no other option but to order cancellation of the contracts, and its decision to do so was entirely reasonable and will not be disturbed.[10]

## IV. Due process claim

▇ Plaintiffs finally argue that by cancelling the CRC contracts, the defendants deprived them of their due process rights.

The Due Process Clause is triggered if a person is deprived of life, liberty, or property without due process of law. U.S. Const. amend V. The threshold inquiry with any due process challenge is to determine whether the challenger was deprived of a protectable interest. In order to have an interest protectable under the Constitution, a person must have a "legitimate claim of entitlement to it." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). An abstract need, desire or unilateral expectation is not enough. *See id.*

▇ Here, plaintiffs assert that they were deprived of a property interest, namely the right to receive benefits under the policy. Defendants argue that plaintiffs had no legitimate property interest in the contracts since the contracts provided for an "at will" termination clause—either party had the option of terminating the contract before March 15, 2001. The heavy weight of the law is in favor of defendants. As a rule, courts uniformly hold that any "at will" relationship, whether it be employment or contractual, does not give rise to a protectable interest. *See, e.g., Bishop v. Wood*, 426 U.S. 341,

---

**9.** Since the court has reviewed The farmers point out that in 2000, the RMA "borrowed" full active trading days from contracts other than the September and July contracts to calculate the average daily settlement price. Thus, argue the farmers, RMA should again "borrow" trading days as they have done in the past. The government responds that in 2000, trading days were borrowed without their knowledge, and that, in any event, the government did not want to continue activity that did not conform to the policy.

Plaintiff's argument that the government should be bound by its previous behavior, even though it is contrary to federal regulations, is essentially an attempt to estop the government. However, "the overwhelming weight of the cases hold[ ] that estoppel will not lie against the government." *Harrod v. Glickman*, 206 F.3d 783, 793 (8th Cir.2000).

Moreover, the Supreme Court has held that "not even the temptations of a hard case" may provide a basis for a recovery that is contrary to federal regulations. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 386, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Plaintiffs' argument is soundly denied.

**10.** At the hearing for the temporary restraining order, the Court expressed its wariness at the government's inability to adopt and implement a viable base price. The Court has been assured, however, that the government reasonably believed that futures market would create a viable base price. In fact, the "FCIC had been assured by a person with the Minneapolis Grain Exchange that having sufficient prices would not be a problem." (United States Brief in Support of Motion to Dismiss, doc. # 28 at 14 n. 5.)

348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp.*, 506 F.2d 467, 470 (9th Cir.1974); *Bukhtia v. Bureau of State Lottery*, 190 Mich.App. 323, 475 N.W.2d 475, 478 (Mich.Ct.App.1991). The reason for this general consensus is obvious: to allow a procedural due process claim for an "at will" termination clause would render such a provision useless and completely eviscerate the meaning and purpose of an "at will" clause; every "at will" termination clause, would, in effect, be transformed into a "for cause" provision. Since an "at will" termination clause does not give rise to a protectable property interest, plaintiffs' due process claim must be denied.

■ Even if, however, plaintiffs had been deprived of a protectable property interest, they fail to meet the other requirements of a due process claim. It is unclear whether plaintiffs are asserting a procedural or a substantive due process violation. In either case, plaintiffs' claims fall short. Procedural due process protections inure to individuals; "[p]ersons are entitled to procedural due process, in the form of an *individual* opportunity to be heard, only when the government makes an *individualized* determination, not when the government commits a legislative act equally affecting all those similarly situated." *Foster v. Hughes*, 979 F.2d 130, 132 (8th Cir.1992) (emphasis added). In other words, procedural due process protections do not extend to general government actions. In the present case, defendants' action to cancel the CRC contracts applied generally to everyone holding such a contract. Such action was not "depend[ant] upon facts and circumstances surrounding each [contract holder]." *Id.* Plaintiffs, in fact, recognize the general nature of their

claim: "This is not an individualized challenge to a particularized adverse decision as applied to a particular farmer ...." (Plaintiffs' Brief in Response to Defendants' Motion to Dismiss, doc. # 39 at 7.) Plaintiffs recognize that defendants' actions "apply across the board." [11] (*Id.*) Since, by all accounts, defendants have acted generally, plaintiffs' procedural due process claim is **DENIED**.

To the extent that plaintiffs assert a substantive due process claim, it also must fail. The bar for alleging a substantive due process claim is set very high; plaintiffs must allege that the action of the government was "truly irrational" or "more than arbitrary and capricious." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 626 (8th Cir.2001). Here, as explained above, the government has set forth rational, plausible, reasonable explanations for its decisions to cancel the policy, and the actions of the government do not rise to the very high level necessary to establish a substantive due process violation. Plaintiffs' due process claim is **DENIED**.

## V. Conclusion

For the reasons stated above, defendant's motion for summary judgment is **GRANTED** (doc. # 20).[12]

Accordingly, plaintiff's complaint and cause of action is **ORDERED DISMISSED**.

**IT IS SO ORDERED.**

---

11. Of course, if plaintiffs had alleged an individualized claim, then they would be subject to exhaustion requirements. *See supra* Part II.A.

12. Since the court has reviewed and considered matters outside the pleadings, defendants' motions are for summary judgment. Fed.R.Civ.P. 12(c).